UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COINTREAU CORPORATION and
COINTREAU SAS,

        Plaintiffs,

        v.

CANOPY GROWTH USA, LLC and
CANOPY GROWTH CORPORATION,

        Defendants

Civil Action No. ___1:21-cv-5921___

## COMPLAINT AND JURY DEMAND

Plaintiffs Cointreau Corporation and Cointreau SAS ("Plaintiffs") file this Complaint against Defendants Canopy Growth USA, LLC ("Canopy US") and Canopy Growth Corporation ("Canopy CA") (collectively "Defendants" or "Canopy"), and allege as follows:

### I.    NATURE OF THE ACTION

1.    Plaintiffs bring this action as a result of Defendants' willful infringement of their world-famous trademark COINTREAU (the "COINTREAU Mark") under Section 31(1) of the Lanham Act, 15 U.S.C. § 1114(1), Defendants' unfair competition and false designation of origin under section 43(a) of the Lanham Act, 15 U.S.C. 15 U.S.C. § 1125(a), Defendants' dilution by blurring of the COINTREAU Mark under Section 43(c) of the Lanham Act, as amended by the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c), and for substantial and

related claims under the statutory and common laws of the State of New York, all arising from Defendants' use of the confusingly-similar mark QUATREAU (the "QUATREAU Mark").

2.      Through over a century of continuous use, tens of millions of dollars in promotional expenditure and sales, unsolicited media attention, and billions of media impressions, the COINTREAU Mark has achieved fame arising from consumers' near-universal recognition that COINTREAU signifies a single source of a unique orange liqueur.

3.      In a beverage industry where a predominant trend is for the same companies to offer alcoholic and non-alcoholic (including CBD-infused) beverages, and the products are displayed alongside each other at liquor stores and other retail outlets, as well as  on premises such as bars and restaurants, Defendants have adopted the QUATREAU Mark with the intention of unfairly trading off the goodwill and reputation of the COINTREAU Mark.  Specifically, Defendants have adopted QUATREAU, instructing consumers to pronounce it as "KWATRO", for a line of cannabis-infused waters and sodas in order to unfairly capitalize on the goodwill and reputation of the COINTREAU Mark.  They have done so knowing full well that COINTREAU (pronounced KWANTRO) with only the "N" sound differentiating it from KWATRO (being the usual pronunciation of COINTREAU) is frequently used for mixed drinks featuring sodas and waters, and which Plaintiffs could reasonably be expected by consumers to expand to flavored waters, sodas, and ready-to-drink cocktails, as evidenced by Plaintiffs' recent US trademark registration.

4.      Defendants' willful actions will not only confuse consumers as to their affiliation with Plaintiffs and the COINTREAU brand, but will blur the exclusive association Plaintiff enjoys between COINTREAU and a single source of orange liqueurs.

5. Continued use by Defendants of QUATREAU will consequently cause irreparable damage to Plaintiffs' COINTREAU brand. Accordingly, Plaintiff seeks injunctive relief and monetary damages.

## II. <u>PARTIES</u>

6. Plaintiff Cointreau Corporation ("Cointreau US") is a New Jersey corporation with a principal place of business located at 1290 Avenue of the Americas, New York, New York.

7. Plaintiff Cointreau SAS ("Cointreau SAS" and together with Cointreau US, "Cointreau" or "Plaintiffs") is a French Société par Actions Simplifiée that is the sole owner of Plaintiff Cointreau US and has a place of business at Carrefour Molière F-49124, Saint-Barthélemy-D'Anjou, France.

8. Upon information and belief, Defendant Canopy US is a Delaware corporation with a principal place of business located at 35715 Highway 40, Evergreen, Colorado, 80439 and holds itself out as having an office in Times Square, New York City. *See* representations by Canopy US, Canopy CA, and a Canopy US employee regarding Canopy US' New York, New York office, attached hereto as **Exhibit A**.

9. Upon information and belief, Defendant Canopy CA is a Canadian federal corporation with a principal place of business located at 1 Hershey Drive, Smith Falls, Ontario K7A 0A8, Canada.

## III. <u>JURISDICTION AND VENUE</u>

10. This is an action in which Plaintiffs seek monetary and injunctive relief for the various acts of Defendants arising under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, and New

York statutory common law. Defendants' unlawful acts have irreparably harmed the goodwill and reputation of Plaintiffs and have caused Plaintiffs significant damage.

11.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121, 28 U.S.C. §1331, and 28 U.S.C. § 1338(a), as this action involves federal questions regarding the Defendants' violations of federal law, including the Lanham Act and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

12.     This Court has personal jurisdiction over Defendant Canopy US because Defendant Canopy US has committed acts of infringement and has a regular and established place of business in this District.

13.     This Court has personal jurisdiction over Defendant Canopy CA because upon information and belief Defendant Canopy CA regularly does business in the State, has contributed to acts of infringement in this State, and/or is a Canadian corporation not subject to general jurisdiction in any state.

14.     Venue is proper in this district pursuant to 28 U.S.C. §§1391(b) and (c) because a substantial part of the events or omissions giving rise to this action occurred in this District, upon information and belief Defendant Canopy US has a place of business in this district, and Defendant Canopy CA is a foreign corporation not resident in the United States.

## IV.     FACTUAL BACKGROUND

### *History of the COINTREAU Brand and Trademark Registrations*

15.     COINTREAU is one of the oldest brands of orange liqueur in the world. Its history dates from 1849, when Adolphe and Edouard-Jean Cointreau, famous master confectioners, established a distillery in Angers, France to create spirits using local fruits.

16.     In 1875, Edouard Cointreau, son of Edouard-Jean, distilled a spirit from sweet and bitter orange peel, with a highly crystalline robe, which was a major novelty at the time.

17.     The first bottles of COINTREAU were sold in 1875.  The first bottle of COINTREAU was sold in the United States at least as early as 1885.

18.     Today, various products are sold under the COINTREAU Mark, including Plaintiffs' world-famous Cointreau orange liqueur and Cointreau Noir blend of orange liqueur and cognac (collectively, the "COINTREAU Products").

19.     Since Plaintiff Cointreau US' inception, it has vigorously protected the famous COINTREAU trademarks by seeking and obtaining U.S. Trademark Registrations as well as registrations around the world, and by vigorously policing Plaintiffs' rights in those registrations. Plaintiff Cointreau US, which is wholly owned by Cointreau SAS, was established in 1941 to own and enforce the COINTREAU trademarks in the United States. Plaintiff Cointreau SAS owns, exploits, and enforces the COINTREAU Marks and other COINTREAU trademarks throughout the world.

20.     Specifically, Plaintiff Cointreau US is the owner of multiple U.S. trademark registrations for the COINTREAU Mark at issue in this litigation, some of which date from at least as early as 1935 and are based on first use of the COINTREAU Mark at least as early as 1885.

21.     Plaintiff Cointreau US' oldest registration for the COINTREAU Mark is the valid, incontestable U.S. Registration Number 329,662 for cordials and liqueurs which issued on December 5, 1935.  A copy of the certificate for this registration for the COINTREAU Mark is attached hereto as **Exhibit B.**

22.     Plaintiff Cointreau US is the owner of six other valid and subsisting trademark registrations for the COINTREAU Mark, word and design marks incorporating the COINTREAU Mark, and trade dress incorporating the COINTREAU Mark, all for cordials and liqueurs in Class 33 which, together with copies of the registration certificates are attached hereto as **Exhibit C.**

23.     Plaintiff Cointreau SAS is the owner of more than one dozen valid and subsisting trademark registrations for the COINTREAU Mark, word and design marks incorporating the COINTREAU Mark, and trade dress incorporating the COINTREAU Mark for both alcoholic beverages in Class 33 and "mineral and aerated waters and other non-alcoholic beverages, namely soft drinks, fruit juices and fruit drinks; syrups and concentrates for making soft drinks, fruit drinks and non-alcoholic fruit juice and fruit drink based cocktails" in Class 32 as well as various other goods and services in Classes 18, 20, 25, 41, and 43.  A table setting forth these registrations and certificates of registration therefor is appended as **Exhibit D.**

### *The Relationship Between the Alcoholic and Non-alcoholic Beverage Markets*

24.     With the legalization of CBD in many states, a growing trend among alcoholic beverage producers is to expand to the CBD-infused beverage market.  For example, Molson Coors has launched its first US non-alcoholic CBD-infused drink line.  *See* https://www.fooddive.com/news/molson-coors-launches-first-us-cbd-drink-line/593354/ appended hereto as **Exhibit E.**

25.     CBD-infused nonalcoholic beverages are now being sold in the same retail outlets as alcoholic beverages , a trend which seems to have accelerated with the Covid pandemic.  As one online news outlet reported in November, 2020 "[c]annabis-infused beverages—especially non-alcoholic ones—are increasingly appearing on the shelves of some beverage alcohol

retailers across the U.S." *See* https://www.marketwatchmag.com/cbd-infused-beverages-begin-appearing-on-shelves-of-beverage-alcohol-retailers/ appended hereto as **Exhibit F**.

26.     Upon information and belief, cannabis-infused beverages for sale in the United States presently include only CBD but will likely in the future to include other active ingredients such as tetrahydrocannabinol ("THC"), as they already do in jurisdictions that permit the use of THC, such as Canada.

27.     Upon information and belief, CBD-infused beverages are sold not only at retail locations, but  at on-premises locations such as bars, restaurants, and lounges, where products are frequently ordered by voice alone, and aural similarity in the names of products is likely to lead to confusion.

28.     At the same that CBD-infused beverages are enjoying a growing market alongside alcoholic beverages, many sellers of non-alcoholic beverages are expanding their offerings to introduce alcoholic drinks.  For example, this year Coca-Cola will be entering the US alcoholic beverages market by introducing a "hard seltzer" version of its Topo Chico product.  See https://www.foxbusiness.com/lifestyle/coca-cola-to-enter-u-s-alcoholic-drinks-market-with-molson-coors-tie-up appended hereto as **Exhibit G.**

29.     Both trends (non-alcoholic beverage producers entering the alcoholic beverage market, and alcoholic beverage producers offering CBD infused drinks) have picked up steam with the growth of the "hard seltzer" and CBD beverage markets.  One market analyst source estimated the market for hard seltzer was valued at USD 4.4 billion in 2019 and expected to grow at a compound annual growth rate of 16.2 percent from 2020 to 2027.  *Forbes* this year published a piece entitled "The Hard Seltzer Market is Getting More Crowded" *See*, respectively, https://www.grandviewresearch.com/industry-analysis/hard-seltzer-market  and

https://www.forbes.com/sites/hudsonlindenberger/2021/01/12/the-hard-seltzer-market-is-getting-more-crowded/ appended hereto as **Exhibit H**.

30.     The futures of alcoholic beverages and cannabis-infused beverages are rapidly converging.  Alcoholic beverages are frequently consumed in "on-premises" locations such as bars, restaurants and lounges, and as states authorize the use of cannabis products, some are licensing "on-site" venues for consumption of cannabis products, which, upon information and belief, are expected to operate in the same manner as bars, restaurants and lounges.  *See*  NY CANBS §  77 "Adult-use on-site consumption license; provisions governing on-site consumption licenses" (McKinney).

### Plaintiff's Imminent Entry into the Nonalcoholic Beverage Market

31.     In keeping with the aforementioned trends in the beverage market, Plaintiff Cointreau SAS is the owner of the valid and subsisting U.S. Registration Number 5,791,019 (the "COINTREAU Water Registration") for the COINTREAU Mark in connection with goods and services including "mineral and carbonated waters and other non-alcoholic beverages, namely, carbonated beverages, fruit juices and fruit beverages; syrups and concentrates for making carbonated beverages, fruit beverages and fruit juices without alcohol and cocktails based on fruit beverages" in International Class 032.  A copy of the registration certificate for U.S. Registration Number 5,791,019 is appended hereto as **Exhibit I.**

32.     The COINTREAU Water Registration issued from the request for extension of protection in the U.S. of an International Registration.  Though, to date, Plaintiffs have not sold COINTREAU water and sodas in the U.S., they are actively considering doing so in the U.S., as such beverages are a logical extension of their COINTREAU brand and consistent with the general marketplace expansion trends noted above.

33.     Further evincing Plaintiffs' likely entry into the non-alcoholic beverage market, Cointreau SAS is the owner of U.S. Registration Number 5,274,315 for COINTREAU THE ART OF THE MIX for, *inter alia*, mineral and aerated waters and other non-alcoholic beverages, namely soft drinks, fruit juices and fruit drinks; syrups and concentrates for making soft drinks, fruit drinks and non-alcoholic fruit juice and fruit drink based cocktails." A copy of the registration certificate for U.S. Registration Number 5,274,315 is included with **Exhibit D.**

34.     Additionally, Plaintiffs promote a soda water-COINTREAU liqueur mixed drink." called "COINTREAU FIZZ" and related flavored drinks such as the "COINTREAU CUCUMBER MINT FIZZ," the "COINTREAU GRAPEFRUIT FIZZ," the "COINTREAU CUCUMBER BASIL FIZZ," and the "COINTREAU PASSION AND PEPPER FIZZ."  See https://www.cointreau.com/us/en/cocktails/cointreau-fizz, appended hereto as **Exhibit J.**  Indeed, Google searches for "COINTREAU and soda" and "COINTREAU and water" disclose as the top results the recipe for a COINTREAU FIZZ mixed soda drink and a COINTREAU TONIC cocktail.  *See* **Exhibit K** for representative recipes.  Indeed, one of Plaintiff Cointreau SAS' registrations is for the mark COINTREAU THE ART OF THE MIX for goods and services relating to mixed cocktails, U.S. Trademark Reg. NUMBER 5,724,316, included in **Exhibit D** appended hereto.

35.     Thus, not only will products bearing the COINTREAU Mark appear alongside QUATREAU CBD products on the same shelves in the marketplace, but consumers recognize that both COINTREAU and QUATREAU waters could be sold.  Such circumstances exemplify the Defendants' intention to trade off the market dominance and fame of the COINTREAU Mark, as set forth below.

*COINTREAU's Market Presence Today*

36.     The strong recognition and exclusive association with a single source enjoyed by the COINTREAU Mark is sure to propel sales when a COINTREAU-branded beverage enters any new market, including the market for ready to drink cocktails, soft drinks, or CBD-infused beverages, just as it is a dominant player in the U.S. market for orange liqueur.  An estimated twelve million bottles of the COINTREAU Products are sold per year, worldwide and approximately 4.13 million were sold in the U.S. last year.  Ninety percent of the COINTREAU Products produced are exported, and the U.S. is one of the largest markets for COINTREAU Products.

37.     By revenue, COINTREAU is ranked number six in the entire liqueur market, including every flavor of liqueurs, not just orange.

38.     In the United States, COINTREAU is the only large brand growing within the orange liqueurs category with a rate of growth over fiscal year 2020/2021 of 24%.

39.     As a result of the long and continued use of its COINTREAU Marks, and as evidenced by its market position, Plaintiffs' parent company Rémy Cointreau is considered one of the premier manufacturers of orange liqueur worldwide and the COINTREAU Mark has come to represent high quality, integrity, authenticity and goodwill not only in the United States but around the world, and is associated exclusively with Plaintiffs and their parent and affiliates.

*The Fame of the COINTREAU Mark*

40.     The COINTREAU Mark is famous in the United States, and indeed, throughout the world as a result of the extensive advertising, promotion and sales of COINTREAU-branded orange liqueur over its more than 170 year history.

41.     Plaintiffs have advertised the COINTREAU Products in the United States through, among other channels, television, print, the internet, social media sites, in-person events, and the Cointreau US website (www.cointreau.com).

42.     For each of the past three years Plaintiff Cointreau US has spent an average of fifteen million dollars annually in the United States to promote COINTREAU Products.

43.     Sales of COINTREAU Products in the United States attest to the success of Plaintiffs' marketing efforts.  For each of the past five years, in the United States alone, Plaintiff Cointreau US has earned in excess of 50 million dollars from sales of the COINTREAU Products, and a total of nearly 300 million dollars over that period.

44.     Also evidencing the fame and brand recognition of the COINTREAU Mark, COINTREAU Products have received the largest number of industry awards for orange liqueur both worldwide and in the United States.  Over the history of the COINTREAU brand, COINTREAU Products have received over 300 awards for product excellence.

45.     Furthermore, COINTREAU Products regularly receive unsolicited press coverage in various media sources across the United States, further demonstrating the fame of the COINTREAU Mark.  Attached hereto as **Exhibit L** are examples of more than five hundred articles, publications, and programs in which COINTREAU Products received unsolicited recognition and accolades during the first six months of 2021, in publications and programs such as *ABC News*, *Esquire, Cosmopolitan*, *Mashed*, and *Food & Wine*.

46.     The volume and frequency of the appearance of the COINTREAU Mark in advertising in a variety of media demonstrate the worldwide recognition of the COINTREAU Mark.  Attached hereto as **Exhibit M** is a media coverage summary showing the variety of publications and programs that published material advertising COINTREAU Products in the

United States in just the first half of the 2020-2021 financial year, through such publications and channels as *Bon Appetit*, *Food Network*, *Esquire*, and Instagram.

47.     As an example of the extensive marketing investment and success by the Plaintiffs, a single marketing campaign oriented around the 2021 Super Bowl resulted in over twelve million television impressions, over 20,000 social media mentions, and dozens of media mentions of the campaign and the COINTREAU Mark. A report on the 2021 Super Bowl campaign and its enormous success and reach is attached hereto as **Exhibit N**.

48.     As set forth in the spreadsheets and reports of Exhibits L, M, and N media impressions featuring the COINTREAU Mark (the number of times online content is displayed), both unsolicited and paid, are well into the hundreds of millions per year.

49.     As a result of Plaintiffs' expenditures of millions of dollars to promote the COINTREAU Products and the COINTREAU MARK, and the success the COINTREAU Products have enjoyed as evidenced by the tens of millions of dollars in sales of in the United States, the COINTREAU Mark is distinctive and has become well known, indeed famous, to the trade and members of the purchasing public, and has established substantial goodwill such that the public associates and identifies products bearing the COINTREAU Mark as coming from a single source.

### *Defendants' Wrongful Conduct*

50.     Upon information and belief, Defendants have transported, distributed, advertised, marketed, offered for sale, and/or sold products infringing on the COINTREAU Mark.

51.     Defendant Canopy US markets and sells a cannabis-infused carbonated beverage containing cannabidiol ("CBD") (the "Quatreau Product") under the QUATREAU Mark. A

screenshot of Defendant Canopy US's webpage promoting the QUATREAU Product is attached hereto as **Exhibit O.**

52.     Upon information and belief, the QUATREAU Product is sold in four flavors, Ginger-Lime, Blueberry-Açai, Cucumber-Mint, and Passionfruit-Guava, and is essentially carbonated water with added hemp concentrate (which contains CBD), flavors, and preservatives.

53.     Upon information and belief, Defendant Canopy US markets and sells the QUATREAU Product in, at a minimum, the states of Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Missouri, Nebraska, Nevada, New Jersey, New Mexico, North Dakota, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Vermont, Virginia, Wisconsin, Wyoming,  A screenshot of Defendant Canopy US's website stating the states in which it sells the QUATREAU Product is attached hereto as **Exhibit P.**

54.     As stated on Defendant Canopy US's own website, the QUATREAU Mark is to be pronounced "KWA-TRO," which differs from the pronunciation of the COINTREAU Mark ("KWAN-TRO") only in that it lacks the internal "N" sound. *See* **Exhibit N.**  Furthermore, the QUATREAU Mark also adopts the French word ending "EAU", identical to that of COINTREAU.  Given the rarity of this three-vowel word ending in English orthography, consumers are likely to focus on this common aspect of the marks.  The impact is even further enhanced by the fact that the final five letters in each mark are also identical, being "TREAU".

55.     As such, the QUATREAU Mark is so aurally indistinguishable from the COINTREAU Mark that it will cause confusion in the marketplace and dilute, by blurring, the distinctiveness of the famous COINTREAU Mark. This is particularly true when a patron calls

out the name(s) KWANTRO or KWATRO to a bartender or server at a restaurant, bar or lounge,; because the marks sound so similar, confusion is inevitable.

56.     The QUATREAU Product is distributed by an alcohol distributor, travels through the same channels of trade as the COINTREAU Product, and is sold in many of the same retail outlets as the COINTREAU Products, including, without limitation, off-premise (liquor stores, grocery stores, package stores) and on-premise (bars, restaurants, casinos, clubs, etc.) retail outlets. *See* Defendants' press release at https://www.canopygrowth.com/investors/news-releases/canopy-growth-signs-u-s-distribution-agreement-with-southern-glazers-wine-spirits-for-cbd-beverage-portfolio/, a copy of which is appended hereto as **Exhibit Q**.

57.     Indeed, Defendants have publicly stated they intend to distribute the QUATREAU Product in "on-premise places like bars, restaurants and casinos," channels of trade through which the COINTREAU Product is sold, and in which the nearly identical aural impressions of COINTREAU and QUATREAU are most likely to cause confusion or mistake among consumers. *See* the article entitled "Southern Glazer's to Distribute Canopy Growth CBD Beverages in the US" from Wine & Spirits Daily, a copy of which is appended hereto as **Exhibit R**.

58.     Upon information and belief, Defendants intend to add THC to their QUATREAU Products if and when the sale of THC-containing products is no longer illegal under federal law.

59.     As noted, alcoholic beverages and nonalcoholic beverages, including CBD-infused nonalcoholic beverages, often originate from a single source. *See* **Exhibit E**.

60.     Upon information and belief, THC-infused beverages are even more closely related to alcoholic beverages than nonalcoholic beverages, including CBD-infused nonalcoholic

beverages, because THC-infused beverages are intoxicating and often consumed for those effects just as alcoholic beverages are.

61.     Defendant Canopy CA is the owner of record of U.S. Trademark Application Serial Number 88/279,427 for QUATREAU and U.S. Trademark Application Serial Number 90/499,313 for QUATREAU and Design QUATREAU, both in connection with "Beers; Non-alcoholic beer flavored beverages; coffee flavored soft drinks; Non-alcoholic beverages containing fruit juices; Semi-frozen carbonated beverages; Mineral and aerated waters beverages; Aerated mineral waters; Soft drinks; Fruit juices and fruit drinks; Carbonated non-alcoholic drinks; Syrups used in the preparation of soft drinks; Non-alcoholic cider; Soft drinks, namely, carbonated soft drinks, low calorie soft drinks, non-carbonated soft drinks, all being infused with herbs; Non-alcoholic beverages flavored with tea" in Class 32 (together, the "QUATREAU Applications").

62.     Defendants are not licensed or authorized by Plaintiffs to use or incorporate the COINTREAU Mark or any mark similar thereto on any of Defendants' products.

63.     Defendants were not licensed or authorized by Plaintiffs to file the QUATREAU Applications.

64.     Defendants' use of the QUATREAU Mark commenced well after Plaintiff's use and extensive worldwide advertising of the COINTREAU Mark.

65.     The continued offering for sale and sale of infringing goods by Defendants will lead to confusion as to the source between Defendants' product and genuine COINTREAU brand liqueurs.  Additionally, such actions will dilute the distinctiveness of the COINTREAU Mark by blurring consumers' exclusive association of that mark with Plaintiff and will tarnish

the COINTREAU Mark's reputation both in the trade and with the purchasing public because the QUATREAU Product is less expensive and a cannabis, rather than alcohol, product.

66. Defendants have caused these infringing products to enter into commerce or to be transported or used in commerce.

## V. CAUSES OF ACTION

### COUNT I

### Violation of Section 32(1) of the Lanham Act
### (Against All Defendants)

67. Plaintiffs repeat and incorporate each by reference each of the preceding paragraphs as if fully set forth herein.

68. Defendants' distribution, advertisement, offering for sale, and sale of products bearing the QUATREAU Mark has caused and is likely to continue to cause confusion, to cause mistake, or to deceive, in violation of Section 32(1) of the Lanham Act (15 U.S.C. § 1114(1)).

69. Defendants' use of the QUATREAU Mark commenced well after Plaintiffs' use and extensive worldwide advertising of the COINTREAU Mark.

70. The word QUATREAU, particularly as pronounced according to Defendants, is so similar to COINTREAU in sound and aural impression that it will cause confusion in the marketplace.

71. Defendants' QUATREAU Product is closely related to Plaintiffs' COINTREAU Products, and, indeed, infused sparkling waters and alcoholic beverages often originate from a single source.

72. Upon information and belief, Defendants intend their QUATREAU Product to eventually contain THC, thereby relating it even more closely to Plaintiff's COINTREAU Products.

73.     Defendants' QUATREAU Product travels through the same channels of trade and often the same distributor as Plaintiffs' COINTREAU Products.  In particular, both Plaintiff's and Defendants' products are distributed through a "three-tier system."  The three tiers are: (1) importers or producers; (2) distributors; and (3) retailers.

74.     Upon information and belief, the activities of the Defendants in selling the infringing QUATREAU Product have been done with the express intention of confusing, misleading, and deceiving purchasers and members of the public into believing they are purchasing COINTREAU Products.

75.     Upon information and belief, Defendants' activities were committed willfully, knowingly, maliciously, and in conscious disregard of Plaintiffs' legal rights.

76.     Plaintiffs have no adequate remedy at law.  Defendants' conduct has caused, and, if not enjoined, will continue to cause immediate and irreparable damage to Plaintiffs' trademark rights, business, reputation, and goodwill in a manner that cannot be adequately calculated or compensated in money damages alone.

77.     Due to Defendants' violations of the Lanham Act, Plaintiffs are entitled to injunctive relief, actual, compensatory and punitive damages in an amount to be determined at trial, attorneys' fees, costs and disbursements.

### COUNT II

**Violation of Section 43(a) of the Lanham Act**
**(Against All Defendants)**

78.     Plaintiffs repeat and incorporate each by reference each of the preceding paragraphs as if fully set forth herein.

79.     Section 43(a)(1) of the federal Lanham Act provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact or false or misleading representation of fact, which — (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or — (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C.A. § 1125(a).

80.     Defendants' distribution, advertisement, offering for sale, and sale of the QUATREAU Product constitute false designations of origin, which are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of the Defendants' product with COINTREAU, or as to the origin, sponsorship, or approval of the Defendants' products by Plaintiffs, in violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)).

81.     Upon information and belief, the activities of the Defendants in selling such infringing products have been done with the express intention of confusing, misleading, and deceiving purchasers and members of the public into believing they are purchasing COINTREAU Products.

82.     Defendants' actions have continued in spite of the Defendants' knowledge that the use of any of Plaintiffs' trademarks, or any reproductions, counterfeits, copies, or colorable imitations of such trademarks, is in violation of Plaintiffs' rights.

83.     Upon information and belief, Defendants' actions were committed willfully, knowingly, maliciously, and in conscious disregard of Plaintiffs' legal rights.

84.     Plaintiffs have no adequate remedy at law.  Defendants' conduct has caused, and, if not enjoined, will continue to cause immediate and irreparable damage to Plaintiffs' trademark rights, business, reputation, and goodwill in a manner that cannot be adequately calculated or compensated in money damages alone.

85.     Due to Defendants' violations of the Lanham Act, Plaintiffs are entitled to injunctive relief, actual, compensatory and punitive damages in an amount to be determined at trial, attorneys' fees, costs and disbursements.

## COUNT III

**Violation of the Section 43(c) Lanham Act (Federal Trademark Dilution Act)**
**(Against All Defendants)**

86.     Plaintiffs repeat and incorporate each by reference each of the preceding paragraphs as if fully set forth herein.

87.     Section 43(c) of Lanham Act, the Federal Trademark Dilution Act, as amended, provides that "the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury."

88.     The COINTREAU Mark is famous and known worldwide and throughout the United States.

89.     The COINTREAU Mark has been in use for over 150 years and became distinctive and famous well before Defendants' wrongful acts alleged herein.

90. Defendants' use of the QUATREAU mark is likely to cause dilution by blurring the exclusive association consumers have when exposed to the COINTREAU Mark, that is, consumer identification of the COINTREAU Marks as originating from a single source.

91. Therefore, Defendants' use of the QUATREAU mark is likely to blur the distinctiveness of the COINTREAU Mark.

92. Plaintiffs have no adequate remedy at law. Defendants' conduct has caused, and, if not enjoined, will continue to cause immediate and irreparable damage to Plaintiffs' trademark rights, business, reputation, and goodwill in a manner that cannot be adequately calculated or compensated in money damages alone.

93. Due to Defendants' violations of the Federal Trademark Dilution Act, Plaintiffs are entitled to injunctive relief, actual, compensatory and punitive damages in an amount to be determined at trial, attorneys' fees, costs and disbursements.

## COUNT IV

**Declaration Denying U.S. Trademark Application or Directing
Defendant Canopy US to Abandon with Prejudice
U.S. Trademark Application Serial Number 88/279,427 for QUATREAU
(Against Defendant Canopy CA)**

94. Plaintiffs repeat and incorporate each by reference each of the preceding paragraphs as if fully set forth herein.

95. The QUATREAU Mark is so similar in pronunciation and aural impression to the COINTREAU Mark that use of the QUATREAU Mark is likely to cause confusion or mistake or deceive consumers as to whether Plaintiffs are affiliated with, sponsor, or endorse the sale of the QUATREAU Product.

96.     The registrability of the QUATREAU Mark is directly related to the subject matter of this action, namely the trademark infringement and dilution of the COINTREAU Mark by the QUATREAU Mark.

97.     The COINTREAU Mark is the subject of multiple U.S. trademark registrations.

98.     Accordingly, under 15 U.S.C. § 1119, and its other authority, this Court should deny U.S. Trademark Application Serial Number 88/7279,427.  Alternatively, this Court should direct Defendant Canopy CA to abandon, with prejudice, Serial Number 88/7279,427.

99.     Additionally, this Court should enjoin Defendants, their successors, privies and assigns, and any person or entity acting on their behalf or in concert with one or both of them from filing any application with the U.S. Trademark Office for the QUATREAU Mark or any mark similar thereto.

**COUNT V**

**Declaration Denying U.S. Trademark Application or Directing
Defendant Canopy US to Abandon with Prejudice
U.S. Trademark Application Serial Number 90/499,313 for QUATREAU and Design
(Against Defendant Canopy CA)**

100.     Plaintiffs repeat and incorporate each by reference each of the preceding paragraphs as if fully set forth herein.

101.     The QUATREAU Mark is so similar in pronunciation and aural impression to the COINTREAU Mark that use of the QUATREAU Mark is likely to cause confusion or mistake or deceive consumers as to whether Plaintiffs are affiliated with, sponsor, or endorse the sale of the QUATREAU Product.

102.     The registrability of QUATREAU and Design mark is directly related to the subject matter of this action, namely the trademark infringement and dilution of the

COINTREAU Mark by the literal portion of the QUATREAU and Design mark, namely the QUATREAU Mark.

103. The COINTREAU Mark is the subject of multiple U.S. trademark registrations.

104. Accordingly, under 15 U.S.C. § 1119, and its other authority, this Court should deny U.S. Trademark Application Serial Number 90/499,313. Alternatively, this Court should direct Defendant Canopy CA to abandon, with prejudice, Serial Number 90/499,313.

105. Additionally, this Court should enjoin Defendants, their successors, privies and assigns, and any person or entity acting on their behalf or in concert with one or both of them from filing any application with the U.S. Trademark Office for the QUATREAU and Design mark that is the subject of U.S. Trademark Application Serial Number 90/499,313 or any mark similar thereto.

## COUNT VI

### Common Law Trademark Infringement
### and Unfair Competition Claim Under New York Law
### (Against All Defendants)

106. Plaintiffs repeat and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

107. Plaintiffs' COINTREAU Mark is a valid and legally protectable mark and is used in commerce in connection with Plaintiffs' orange liqueur products.

108. There is a likelihood of confusion arising from Defendants' use of the QUATREAU Mark for CBD-infused soft drinks.

109. Defendants' use of the QUATREAU Mark constitutes common law trademark infringement and unfair competition, in violation of New York law.

## COUNT VII

### Injury to Business Reputation; Dilution under N.Y. Gen. Bus. Law § 360-l
### (Against All Defendants)

110. Plaintiffs repeat and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

111. The COINTREAU Mark has acquired distinctiveness.

112. The QUATREAU Mark is substantially similar to the COINTREAU MARK in aural impression.

113. Defendants' imitation and/or use of the QUATREAU Mark has injured and, unless enjoined, is likely to continue to injure Plaintiffs' business reputation and/or likely to dilute the distinctive quality of the COINTREAU Mark in violation of Section 360-l of the New York General Business Law.

114. Plaintiffs have no adequate remedy at law. Defendants' conduct has caused, and if not enjoined, will continue to cause immediate and irreparable damage to Plaintiffs' trademark rights, business, reputation, and goodwill in a manner that cannot be adequately calculated or compensated in money damages alone.

115. Due to Defendant's violations of New York law, Plaintiffs are entitled to injunctive and equitable relief.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.    A judgment entered in favor of Plaintiffs on its claims that each of Defendants Canopy US and Canopy CA have infringed and diluted Plaintiff's COINTREAU Mark;

B.    A permanent injunction restraining the Defendants, their successors, privies and assigns, and any person or entity acting on their behalf or in concert with one or both of them from:

(i)        Directly or indirectly infringing Plaintiffs' registered or common-law trademarks for the COINTREAU Mark in any manner, including but not limited to, manufacturing, distributing, advertising, selling, or offering for sale any products that infringe the COINTREAU Mark; and

(ii)      Using the COINTREAU Mark or any reproduction, counterfeit, copy, or colorable imitation of such mark in connection with the manufacture, distribution, advertising, display, marketing, sale, offering for sale, or other use of any product; and

(iii)    Using any word, term, name, symbol, or device, or any combination thereof, on any product or its packaging or labeling or using any false designation of origin, false, or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake or to deceive as to the affiliation, connection, or association of a defendant with Plaintiffs or as to the origin, sponsorship, or approval of a defendant's goods by Plaintiffs; and

C.      An Order directing the U.S. Trademark Office to refuse, or Defendant Canopy CA to abandon with prejudice, U.S. Trademark Application Serial Nos. 88/7279,427 and 90/499,313 and directing Defendants, their successors, privies and assigns, and any person or entity acting on their behalf or in concert with one or both of them, to refrain from filing any new U.S. trademark applications for the QUATREAU Mark or any mark similar thereto or to the COINTREAU Mark;

D.      An accounting of Defendants' profits realized in connection with the sale of infringing products, and an award in such amount to Plaintiffs; and

E.      An award to Plaintiffs of exemplary damages; and

F.      An Order deeming this case an exceptional case pursuant to 15 U.S.C. § 1117(a) and that Defendants be deemed liable for and be ordered to pay Plaintiffs, in addition to the

aforesaid damages, Plaintiffs' costs and attorneys' fees, and that the amount of actual damages be trebled; and

G.      Such other and further relief as the Court may deem just and necessary.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by a jury on all issues so triable.

Respectfully submitted,

/jeanne hamburg/
Jeanne Hamburg
jhamburg@norrislaw.com

Bruce S. Londa
bslonda@norris-law.com

David H. Siegel
dsiegel@norris-law.com

NORRIS MCLAUGHLIN, P.A.
7 Times Square, 21st Floor
New York, NY 10036
212-808-0700

**ATTORNEYS FOR PLAINTIFFS COINTREAU CORPORATION AND COINTREAU SAS**